## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Omari Keisaun Mason,<br>    Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:21cv1118 (LMB/JFA) |
| | ) | |
| Kevin Talley, et al., | ) | |
|    Defendants. | ) | |

MEMORANDUM OPINION

This matter is before the Court upon a Motion for Summary Judgment ("Motion") [Dkt. No. 39] filed by defendants Lt. Kevin Talley, Major Frank Mack III, Superintendent Larry Leabough, Sergeant Binns, Sergeant McKelvin, and Officer Jones (collectively "defendants") in this civil rights action filed under 42 U.S.C. § 1983 by Omari Keisaun Mason[1] ("plaintiff" or "Mason"). Plaintiff, who is proceeding pro se, alleges in his Complaint and Supplemental Complaint that defendants, who are employees of Riverside Regional Jail ("RRJ"), improperly held him in restricted confinement for extended periods of time without providing him adequate consideration for return to the general population, that his conditions of confinement in the restricted housing unit—including two instances in which he was kept in "full restraints" for extended periods of time—were unconstitutional, and that he received unequal treatment as compared to other inmates at the facility. See [Dkt. Nos. 1, 33]. Defendants argue in their Motion that plaintiff failed to exhaust his claims, that the claims are without merit, and that defendants are immune from liability under the doctrine of qualified immunity. [Dkt. No. 40].

---

[1] Plaintiff was a Virginia state inmate when he filed the Complaint. He now is in federal custody. See [Dkt No. 44]; FIND AN INMATE., https://www.bop.gov/inmateloc/ (enter "Omari" in the field entitled "First," enter "Mason" in the field entitled "Last," click "Search" button) (last accessed March 22, 2023).

Defendants' Motion will be granted in part and denied in part. As explained below, a factual dispute precludes the entry of judgment with respect to defendants' exhaustion argument; however, the record supports judgment in defendants' favor on the merits of the majority of plaintiff's claims. Indeed, the record shows that plaintiff routinely committed serious disciplinary offenses while incarcerated at RRJ, including possessing contraband, committing acts of violence against both inmates and jail staff, attempting to escape, and disregarding the orders of officers, and that these infractions justified plaintiff's placement in, and continued assignment to, the restricted housing unit in the jail. Because the record is not sufficiently developed with respect to the allegations that plaintiff was twice left in full restraints for extended periods of time, summary judgment will be denied with regard to that claim and defendants Jones and McKelvin will be directed to produce further briefing on the issue.

## I. Background

### A.    *The Complaint and Supplemental Complaint*

The Complaint alleges that, on July 14, 2021, plaintiff was placed in "restricted confinement" to serve a five-day sentence arising out of a disciplinary hearing. [Dkt. No. 1] at 5. According to the Complaint, plaintiff remained in restricted housing for longer than the five-day period to which he was sentenced and, seeking a return to general population, he filed informal complaints and grievances on July 25, 2021, August 2, 2021, and August 12, 2021. Id. Plaintiff did not receive any written responses to these documents. Id. On an unspecified date, plaintiff allegedly spoke to Lt. Kevin Talley and told him that he intended to file a lawsuit over this issue, in response to which Talley stated he was "not worried about it." Id.

After plaintiff was involved in a fight with another inmate on August 10, 2021, he was required to wear "full restraints" during his designated recreation time. Id. at 5-6. The restraints allegedly made it difficult for plaintiff to move or exercise, which caused him to become depressed. Id. at 6. Plaintiff filed grievances about this issue and his continued presence in

2

restricted confinement and was told that he would "remain in restricted confinement until [he] leave[s] this jail." Id.

The Supplemental Complaint adds allegations regarding incidents that occurred in January 2022. According to the Supplemental Complaint, on January 4, 2022 plaintiff was "brought to 1C-A on allegations of [] possession of a cellular phone" but "never received an institutional charge or ... disciplinary hearing for [these] allegations." [Dkt. No. 33] at 5. On January 7, 2022, Officer Jones brought plaintiff out of his cell for his allotted recreation time and "chained [plaintiff] to the phones ... for 6 ½ hours." Id. During this time, the handcuffs used to secure plaintiff were "cutting into [his] skin" but "nobody came to check on [his] wrists." Id. at 6. At one point, plaintiff informed Jones that he needed to use the restroom, but Jones stated that "he couldn't move [plaintiff] off the phone by [himself] that he needed another officer to be with him." Id. Jones apparently failed to secure assistance, and plaintiff eventually urinated on himself. Id. at 5. A day or two later, Lt. McKelvin allegedly chained plaintiff "for an additional 2 or 3 hours," during which time plaintiff "passed out . . . due to dehydration." Id. at 6.

**B.**   _**Statement of Undisputed Facts**_ [2]

The following facts are uncontested. At all times relevant to this civil action, plaintiff was a convicted inmate housed at RRJ, a correctional facility in North Prince George, Virginia. RRJ classifies and houses its inmates pursuant to an administrative classification system. [Dkt. No. 40-13] at ¶ 3. Upon admission to the facility, inmates are evaluated based on the seriousness of their charges, their criminal records, including escape attempts, as well as their institutional

---

[2] The contents of this section are derived from the many affidavits and documents defendants have submitted in support of their Motion, [Dkt. No. 40], as well as the "sworn statement" plaintiff submitted in opposition to the Motion. [Dkt. No. 41] at 1-9, 40. Because neither the Complaint nor the Supplemental Complaint are sworn, they are not considered as evidence at the summary judgment stage. See, e.g., Huff v. Outlaw, No. 9:09-cv-520, 2010 WL 1433470, at *2 (D.S.C. Apr. 8, 2010) ("[T]he law is clear that a plaintiff cannot rely on an unverified complaint in opposing a motion for summary judgment.").

disciplinary history. Id. Although most inmates are assigned to general population, others are placed in alternative housing units for a variety of reasons, including for protection or for specific medical or mental health needs. Id.

Inmates found guilty of disciplinary violations while incarcerated at RRJ may be assigned to "disciplinary detention" in the restricted housing unit ("RHU"), where they are locked in their cells for twenty-three hours per day and have five one-hour periods per week in which they are allowed to move around the unit for exercise or to take a shower. Id. at 4, 6. Inmates housed in the RHU for disciplinary detention "generally do not have access to the telephone, except for legal phone calls and emergencies," and they do not have access to the canteen except for hygiene products and stationery. Id. at ¶ 6-7.

Inmates also may be housed in the RHU for "restricted confinement," which is also referred to as "administrative detention." Id. at ¶ 5. Restrictive confinement is "designed to ensure the safety and security of all inmates and staff" and is not intended to be punitive. [Dkt. No. 40-18] at ¶ 3. Officials consider the inmate's history of disciplinary violations, possession of contraband, assaultive conduct, or other incidents that threaten institutional security in making that determination. Id. If officials conclude that the inmate poses a danger to himself, other inmates, or staff, they may determine that the inmate's continued placement in the RHU is appropriate. Id. Inmates who are held in restrictive confinement receive regular reviews by the Restrictive Housing Review Committee ("Review Committee"). Id. at ¶ 4; [Dkt. No. 40-22] at 10. The Review Committee, which is composed of officials from a variety of RRJ's departments, including medical health, mental health, the classification department, and institutional security, determines whether inmates in the RHU should be awarded additional privileges or transferred to less restrictive housing areas. [Dkt. No. 40-18] at ¶ 4.

Plaintiff has been incarcerated at RRJ on at least six different occasions. He first arrived as an inmate at the facility on November 14, 2016. See [Dkt. No. 40-19] at 3. On March 18,

4

2020, he was booked at RRJ based on the criminal charges for which he is now serving a sentence. [Dkt. No. 40-20] at ¶ 5. Although plaintiff was released on bond on March 21, 2020, he returned to RRJ on June 15, 2020 after being charged with being a violent felon in possession of a weapon and for possession of marijuana. [Dkt. No. 40-4] at 4; [Dkt. No. 40-19] at 2. Plaintiff was again released on bond on June 19, 2020 but returned to RRJ on August 19, 2020.[3] See [Dkt. No. 40-6] at 1; [Dkt. No. 40-19] at 2; [Dkt. No. 40-20] at ¶ 6.

In his various periods of incarceration at RRJ, plaintiff has incurred multiple disciplinary violation charges. On October 4, 2020, while conducting a security and observation round, Officer Mayes noticed that plaintiff was not in his assigned cell. [Dkt. No. 40-15] at 12. After Mayes found plaintiff in a different cell and escorted him back to his own cell, plaintiff stated, "That's aight, I will see you on the outside. I don't fight officers, only closed caskets." Id. For these actions, plaintiff was charged with "entering the cell of another inmate without the permission of an officer," "escape or attempt to escape," and "insinuated threat or behavior." [Dkt. No. 40-15] at 11.

On October 15, 2020, Officer Casey issued numerous warnings to "the top tier"—where plaintiff was housed—that its recreation period was ending and that its occupants would soon be required to return to their cells. [Dkt. No. 40-15] at 10. After Casey issued an actual order for inmates to return to their cells, plaintiff refused and was seen remaining "in the dayroom." Id. Consequently, plaintiff was charged with "failing to immediately lockdown when instructed to do so," "plotting and planning to break the law or these rules," and "failing to follow the directions of staff thereby causing a security breach." Id. at 9.

On December 15, 2020, Sergeant Sample observed plaintiff "in the hallway" when he should have been in the "One Delta pod." [Dkt. No. 40-15] at 7. When Sample asked why

---

[3] The Court has not been able to discern the specific reason plaintiff returned to RRJ on this occasion.

plaintiff was not in his assigned area, plaintiff stated that "he had to give a number to his homeboy." Id. For these actions, plaintiff was charged with "loitering, hiding, or being in an unauthorized area." Id.

On January 23, 2021, as Officer Mayes attempted to serve plaintiff his dinner, plaintiff attempted to escape his cell, pushing Officer Mayes away in the process. [Dkt. No. 40-15] at 5. Mayes pushed plaintiff back into his cell, at which point plaintiff "grabbed [Mayes'] neck, scratching [him] in the process." Id. Mayes then sprayed plaintiff with an "OC canister." Id. Despite having been sprayed, plaintiff then "ran to the top tier" before being handcuffed and taken to the medical department for assessment. Id. For this incident, plaintiff was charged with "assault on staff." Id.

Plaintiff's claims in this litigation relate to events that began on July 14, 2021. On July 8, 2021, plaintiff had been convicted of several criminal offenses in the Prince George County Circuit Court. [Dkt. No. 40-1] at 7; [Dkt. No. 40-2] at 1-2. On July 14, 2021, an unidentified individual "observed [plaintiff] on Facebook Live [] smoking what appeared to be marijuana" within RRJ. [Dkt. No. 40-13] at ¶ 9. In response, Major Mack and Lt. Brown entered and searched plaintiff's cell. Id. The officials found "[a] white powdery substance on [plaintiff's] body," a cell phone, a USB charger adapter, an iPhone charger, a red Sharpie marker, a black Sharpie marker, a red pen, and two cigarette butts. Id. Plaintiff was moved from his cell to "pre-hearing detention housing" and charged with possession of contraband. Id. at ¶ 10. Plaintiff was informed of his right to call witnesses and present evidence at his disciplinary hearing, which occurred on July 19, 2021. Id. After the hearing, plaintiff was found guilty of possessing contraband and sentenced to five days in disciplinary detention. Id.

Following completion of plaintiff's disciplinary detention, the Review Committee reviewed plaintiff's assignment and determined that he should remain in the RHU in restricted confinement (administrative detention). Id. at ¶ 11; [Dkt. No. 40-16] at 5. On July 27 and

6

August 10, 2021, the Review Committee again determined that plaintiff should remain in the

RHU in restricted confinement.  Id. at 4.  Just hours after the Review Committee's August 10

review, plaintiff was seen "throwing close[d] fist[s] and kicking" another inmate in the head.

[Dkt. No. 40-14] at 20.  As a result, he was charged with "assault, plotting and planning, and

creating a security disturbance."  [Dkt. No. 40-13] at ¶¶ 12-13.

The Review Committee met again on August 17, 2021 and, noting that plaintiff had a

pending disciplinary hearing, determined that plaintiff should remain in the RHU.  [Dkt. No. 40-

16] at 3.  Before the August 19, 2021 disciplinary hearing, plaintiff was informed of his right to

call witnesses and present evidence.  [Dkt. No. 40-13] at ¶ 16; [Dkt. No. 40-14] at 22.  At the

hearing, plaintiff was found guilty of the charges against him and sentenced to serve twenty days

of disciplinary detention.  [Dkt. No. 40-13] at ¶ 16; [Dkt. No. 40-14] at 22-23.

On August 22, 2021, plaintiff was charged with "creating a security disturbance causing

staff to respond," "insinuated threat or behavior," and "lying to staff."  [Dkt. No. 40-14] at 11-16.

This occurred after plaintiff witnessed a correctional officer provide a snack bag to another

inmate, at which point plaintiff stated, "Fuck me, right!  I want to kill myself.  [G]et somebody

down here."  Plaintiff then "stated he would throw piss at [the officer] if [he] did not get another

staff member."  Id. at 15.  On August 23, 2021, plaintiff received a Notice of Disciplinary

Hearing form that listed two major charges and one minor charge against him, and he indicated

on that form that he wished to have a hearing and waived his right to "24 hour notice to a

hearing."  Id. at 11.  It is not possible to determine from the record whether a hearing was held

and whether these charges resulted in any discipline.

The Review Committee continued to evaluate plaintiff's housing assignment, meeting on

August 24, 2021 and September 3, 2021, and determined on each occasion that plaintiff should

remain in the RHU.  [Dkt. No. 40-16] at 3.  Hours after the September 3 Review Committee's

review, plaintiff expressed a desire to kill himself after being told he could not take a shower.

7

[Dkt. No. 40-14] at 18.  Plaintiff voluntarily sat in a restraint chair and was temporarily transferred to booking for observation before being transported back to the RHU at approximately 1:15 a.m.  Id.

On September 8, 2021, the Review Committee examined plaintiff's housing assignment and determined that he should remain in the RHU; however, it commented that plaintiff "will be removed from double doors due to positive behavior."  [Dkt. No. 40-17] at 9.

On September 19, 2021, Sgt. Kindred announced that the inmates in plaintiff's housing unit were scheduled to undergo drug testing via urinalysis. [Dkt. No. 40-14] at 8.  Plaintiff refused to undergo testing and was charged with "failing to obey the instructions of an officer and other staff at all times."  Id.  Jail staff held an "Informal Resolution" hearing at which plaintiff accepted a sanction of three days in the RHU.  Id. at 7.

On September 21, 2021, the Review Committee again determined that plaintiff should remain in the RHU.  [Dkt. No. 40-16] at 3; [Dkt. No. 40-17] at 8.  That same day, Major C. Armstrong searched plaintiff's cell.  [Dkt. No. 40-16] at 17.  Armstrong discovered that "the light switch cover had been removed and a clothesline was tied to one of the exposed wires."  Id.  Armstrong also found that "[t]he mattresses on both the top bunk and bottom bunk had extra mattress stuffing from what appeared to be at least two other mattresses."  Id.  Finally, Armstrong found "two cups containing several unknown pills" and a lighter.  Id.  Based on these findings, plaintiff was charged with "destroying state or authority property," "possessing contraband," and "hoarding or attempting to hoard medication."  Id.  After a hearing, plaintiff was sanctioned with loss of seven days of recreation time.  [Dkt. No. 40-14] at 4.

On October 5 and 19, 2021, the Review Committee considered plaintiff's housing assignment and determined that he should remain in the RHU.  [Dkt. No. 40-16] at 2-3; [Dkt. No. 40-17] at 6-7.  On or around November 11, 2021, plaintiff was witnessed on video "throwing left and right punches toward[]" another inmate and was consequently charged with "assault"

and "entering the cell of another." [Dkt. No. 40-15] at 15.  On November 16, the Review

Committee reviewed plaintiff's housing assignment and, because of plaintiff's "multiple assaults

on other inmates," determined that plaintiff should remain in the RHU.  [Dkt. No. 40-17] at 5.

Plaintiff received a disciplinary hearing for his assault charge on November 18, 2021.  [Dkt. No.

40-15] at 17-18.  He was advised of his rights before the hearing and was ultimately found guilty

and sanctioned with twenty days of disciplinary detention.  Id.

On November 23 and 30, 2021, the Review Committee reviewed plaintiff's housing

assignment and concluded on both occasions that plaintiff should remain in the RHU.  [Dkt. No.

40-16] at 2; [Dkt. No. 40-17] at 3-4.  On December 21, 2021, the Review Committee reviewed

plaintiff's housing assignment and concluded that plaintiff was fit to return to general population.

[Dkt. No. 40-17] at 2.

On January 4, 2022, RRJ officials searched plaintiff's cell and discovered a cell phone.

[Dkt. No. 40-23] at ¶ 3.  Plaintiff was then charged with possession of contraband and placed in

prehearing detention while awaiting a disciplinary hearing.  Id.; [Dkt. No. 40-17] at 1.

On January 7, 2022, while still being held in prehearing detention, plaintiff was placed in

restraints and taken to his one-hour recreation session.  [Dkt. No. 40-23] at ¶ 4.  Because plaintiff

asked to make a phone call, Officer Jones "chained" plaintiff to the phone before doing rounds.

[Dkt. No. 41] at 3-4.  Officer Jones explained to plaintiff that he was unable to  allow plaintiff to

change locations without another correctional officer, and plaintiff remained "chained" to the

phone for roughly six and a half hours.  Id.  During this time, plaintiff repeatedly asked to use the

bathroom but that request was denied.  Id.  As a result, plaintiff "was forced to urinate all over

[himself]." [4]  Id.

---

[4] In the argument section of their Motion, defendants "deny that Mason was restrained for six
hours and thus denied the bathroom as alleged in the Supplemental Complaint," [Dkt. No. 40] at
17 n.5, but do not provide any evidence in the form of affidavits or documents that undermine
plaintiff's statements.  Because plaintiff has included this detail in a sworn statement filed in

On January 12, plaintiff was once more placed in restraints—this time by Sgt. McKelvin—and escorted to his recreation period. [Dkt. No. 40-23] at ¶ 5. Plaintiff was again "chained" to the phone, this time for four or five hours. [Dkt. No. 41] at 4. During this time, plaintiff became dehydrated and, as a result, fell and struck his head on the phone. Id. Plaintiff was then medically evaluated and provided fluids. [Dkt. No. 40-23] at ¶¶ 6-7.

## II.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of law, the nonmoving party "must show that there is a genuine dispute of material fact for trial … by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v. Fairview Prop. Inv'rs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for summary judgment, a district court should consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Summary judgment is generally inappropriate "where the parties have not had an opportunity for reasonable discovery." E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc., 637 F.3d 435, 448-49 (4th Cir. 2012). The Fourth Circuit recently reaffirmed this principle in Shaw v. Foreman, ___ F.4th ___, 2023 WL 1486310 (4th Cir. 2023), finding that the district court had abused its discretion by granting summary judgment before discovery because the

---

opposition to the Motion for Summary Judgment, [Dkt. No. 41] at 3-4, his version of this event is listed here as an undisputed fact.

court "was on fair notice of potential disputes as to the sufficiency of the summary judgment record. . . Much of the evidence that [the plaintiff] needs in this matter to combat a motion for summary judgment either bears on the Prison Officials' subjective knowledge or is in their exclusive control." Moreover, the Fourth Circuit observed that the plaintiff in Shaw had "impliedly" sought discovery by stating that "after investigating defendants' evidence, this court will find that the defendants" knowingly violated plaintiff's rights. Finally, the Fourth Circuit stated that summary judgment was not appropriate because a videotape that was "core to [the plaintiff's] theory of vindication for the underlying disciplinary offense," for which he had made multiple requests to review and which was in the defendants' exclusive control, "had yet to surface." Id. at *5. "In such situations," the Fourth Circuit opined, "premature summary judgment is particularly disfavored." Id.

This civil action is sufficiently different from Shaw that summary judgment before the start of discovery is appropriate, because, unlike in Shaw, there is no core piece of evidence in the defendants' exclusive control to which plaintiff has been denied access. Instead, plaintiff only has obliquely implied in his Opposition to the Motion that he wishes to "subpoena" two individuals—Ms. Canada and Dr. Cox—whom he claims can "confirm [his] facts in [his] civil suit." See [Dkt. No. 41] at 1, 40. Unlike in Shaw, the evidence plaintiff desires—presumably affidavits from Ms. Canada and Dr. Cox—are not in the "exclusive control" of the defendants. Plaintiff could have sought to contact these individuals and request that they voluntarily provide the information he seeks.   In fact, both this Court and the defendants provided plaintiff with Roseboro[5] notices explaining that plaintiff "must" submit affidavits in opposition to any dispositive motion defendants filed.[6] See [Dkt. No. 34] at 2; [Dkt. No. 39] at 1-2.  Consequently,

_____

[5] See Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

[6] In Shaw, the Fourth Circuit highlighted the importance of the Roseboro notice, stating that, if a nonmovant received such a notice, it was "particularly" true that the party "cannot complain that

11

plaintiff was on notice of his right, and obligation, to file affidavits with his opposition, but there is no indication that he made any effort to obtain sworn statements from Ms. Canada and Dr. Cox. Most significantly, because plaintiff states that the information he desires from Ms. Canada and Dr. Cox would merely "confirm" the facts he provides in his sworn statement, it appears that any evidence these individuals would offer would be merely cumulative of information plaintiff himself has provided. Thus, it cannot be core information in the exclusive control of defendants. For these reasons, the Court finds this action sufficiently dissimilar to Shaw that considering the pending Motion for Summary Judgment without further delay is appropriate.

### III. Analysis

Defendants argue that they are entitled to judgment in their favor for three reasons: because plaintiff failed to exhaust administrative remedies before filing this suit, because they did not violate his constitutional rights, and because they are protected by qualified immunity. See [Dkt. No. 40]. Plaintiff has submitted sufficient documentation to create a factual dispute with respect to whether the administrative grievance process was fully available to him. See [Dkt. No. 41]. Consequently, giving the plaintiff the benefit of the doubt, the Court will deny defendants' exhaustion argument; however, review of the record makes clear that defendants are entitled to judgment as to the merits of plaintiff's claims, with the exception of plaintiff's claim based on being held in full restraints, which is not adequately briefed.

### A.   **Merits of Plaintiff's Constitutional Claims**

Plaintiff's Complaint and Supplemental Complaint, viewed deferentially, appear to assert four claims: (1) defendants violated plaintiff's due process rights by keeping him in the RHU after the end of his period of disciplinary confinement; (2) defendants denied plaintiff due

---

summary judgment was granted without discovery unless that party ... attempt[ed] to oppose the motion on the grounds that more time was needed for discovery." Shaw, at *4, *4 n.1 (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)).

process or consideration when they continued his administrative confinement in the RHU; (3) the conditions of his confinement in the RHU violated his Eight Amendment rights; and (4) defendants violated his Equal Protection rights because other similarly situated inmates were released from the RHU more quickly than he was.

### 1. *Continued Confinement in the RHU*

Plaintiff claims that he was held in the RHU for longer than the period of his disciplinarily sanction, and that he did not receive adequate process or consideration for release from the RHU, in violation of the Due Process Clause of the Fourteenth Amendment. The Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. To establish a procedural due process violation, a plaintiff must satisfy a two-part test. First, he must demonstrate that he had a protected liberty interest in avoiding the conditions he was forced to endure. See Incumaa v. Stirling, 791 F.3d 517, 526 (4th Cir. 2015). Second, he must prove that defendants did not provide the process he was owed before depriving him of that liberty interest. Id.

The United States Constitution does not provide convicted prisoners such as plaintiff a liberty interest in avoiding placement in segregation or restricted housing. See Neitzke v. Williams, 490 U.S. 319, 324 (1989) ("[T]he law is clear that prisoners have no constitutionally protected liberty interest in remaining in a particular wing of a prison."). Consequently, to succeed as to this claim, plaintiff must identify a state-created liberty interest in avoiding continued confinement in the RHU. See Prieto v. Clarke, 780 F.3d 245, 248-52 (4th. Cir. 2015). To do so, he must show that there is "a basis for an interest or expectation in state regulations" for avoiding such confinement and demonstrate that the conditions "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 249 (citing Sandin v. Connor, 515 U.S. 472, 484 (1995)).

13

With respect to whether an interest or expectation in state regulations exists, defendant Leabough has submitted an affidavit in which he attests that inmates held in the RHU "receive regular reviews of their classification to evaluate whether [their] behavior will allow a change to a less restrictive housing environment while meeting the institution's interests in maintaining order and safety." [Dkt. No. 40-18] at ¶ 4. Leabough's affidavit mirrors the language of an RRJ policy entitled "20.1.006 Classification," which also states that inmates in the RHU receive "periodic review" of their classification and housing assignment. [Dkt. No. 40-22] at 10. This policy is a sufficient basis on which to find that the first prong of the Prieto test is satisfied. Cf. Incumaa, 791 F.3d at 527 (finding that a state prison policy requiring a thirty-day administrative segregation review created a potential liberty interest).

In contrast, the record does not support a finding that the conditions plaintiff experienced constituted an "atypical and significant hardship." Prieto, 780 F.3d at 248-52. Relying on the Supreme Court's reasoning in Wilkinson v. Austin, 545 U.S. 209 (2005), the Fourth Circuit "has construed the atypical-and-significant-hardship analysis as turning on primarily three factors: (1) the magnitude of confinement restrictions; (2) whether the administrative segregation is for an indefinite period; and (3) whether assignment to administrative segregation had any collateral consequences on the inmate's sentence." Smith v Collins, 964 F.3d 266, 275 (4th Cir. 2020) (internal quotations omitted).

The first Wilkinson factor weighs marginally in plaintiff's favor because the conditions described in plaintiff's "sworn statement" resemble the conditions that supported the finding of a liberty interest in Wilkinson. Specifically, it is undisputed that, while assigned to the RHU, plaintiff remained in his cell for twenty-three hours per day and spent only one hour outside. Cf. Wilkinson, 545 U.S. at 214. For at least some of the time he was held in the RHU, plaintiff was kept behind "double doors," cf. id. (inmates kept behind "solid metal doors with metal strips along their sides and bottoms"), and was placed in full restraints whenever he left his cell.

14

Additionally, plaintiff was unable to participate in visitation, was initially restricted from using the telephone, and could not purchase items from the commissary. Cf. id. (describing opportunities for visitation as "rare"). However, the record also makes clear that plaintiff was not entirely segregated from other inmates, as he was able on several occasions to leave his cell and, at times, assault other individuals.

The second Wilkinson factor weighs in favor of defendants. When considering this second factor, "courts have looked to the indefiniteness of [the housing assignment], as well as its duration." Smith, 964 F.3d at 277. The Fourth Circuit has specifically emphasized the importance of "meaningful procedural review" when an inmate is assigned to restrictive housing "for an indefinite period." Id. Here, it is undisputed that plaintiff consistently received such procedural review while he was held in the RHU. Specifically, the record demonstrates that the Review Committee, which consisted of RRJ staff members from various departments such as mental health, medical health, and institutional security, reviewed plaintiff's placement in the RHU at least thirteen times between July and December of 2021—roughly once every twelve days on average.

As for the duration facet of this element, it is undisputed that, for the six-month period relevant to this suit, plaintiff spent most of his time in the RHU.[7] Although this length of confinement was substantially longer than the initial five-day disciplinary sanction plaintiff received, the record demonstrates that plaintiff committed numerous disciplinary offenses while in the RHU and that these repeated breaches justified plaintiff's continued presence in the RHU on restricted confinement. Moreover, the six-month period at issue in this case is comparable to the length of administrative confinement at issue in Beverati v. Smith, in which the Fourth

---

[7] Plaintiff claims in his Opposition to the Motion for Summary Judgment that he "was in restricted confinement for 10 or 11 months at one time," but this allegation appears to refer to a period of time before the allegations in the Complaint, which focuses on events taking place during a six-month period from July 2021 to January 2022.

Circuit found there was no protected liberty interest in avoiding placement in administrative confinement.  120 F.3d 500, 503-04 (4th Cir. 1997).  Additionally, six months is far less time than the periods of incarceration described in many cases in which a liberty interest was found to exist.  See, e.g., Incumaa, 791 F.3d at 531 (twenty-year period); Smith, 964 F.3d at 278-79 (four years and six month period); Shoats v. Horn, 213 F.3d 140, 144 (3d Cir. 2000) ("[E]ight years in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life."); Laue v. Johnson, 117 F. App'x 365, 366 (5th Cir. 2004) ("We will assume arguendo that Laue's eight years of confinement in administrative segregation constitutes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'").

Finally, plaintiff's claims fail to satisfy the third Wilkinson factor.  The record contains no evidence, and the Complaint does not allege, that plaintiff's assignment to the RHU had any collateral impact on his sentence.  For instance, plaintiff was assigned to the RHU within RRJ, unlike the plaintiff in Wilkinson who was taken to a separate facility with a higher security designation.  In addition, there is no evidence that plaintiff was ineligible to earn good-time credits while he was held in the RHU, as was the case for the plaintiff in Smith.[8]

Even if plaintiff had shown that he had a state-created liberty interest in avoiding continued confinement in RRJ's RHU, the record demonstrates that defendants provided plaintiff adequate process to protect that hypothetical interest.  The Fourth Circuit has commented on its own lack of precedent with regard to "the exact [level of] process prisoners must receive while in

---

[8] Plaintiff alleges in passing that defendants violated his right to substantive due process as well as procedural due process.  [Dkt. No. 41] at 3.  Because the Court concludes that the record does not support the existence of any liberty interest, plaintiff's substantive due process claim fails. Cf. Beverati v. Smith, 120 F.3d 500 (4th Cir. 1997) ("[B]ecause they possessed no liberty interest in avoiding confinement in administrative segregation, the district court properly granted summary judgment in favor of prison officials on Inmates' procedural and substantive due process claims.").

long-term administrative segregation," Thorpe v. Clarke, 37 F.4th 926, 944 (4th Cir. 2022), yet it is beyond debate that "due process is flexible and calls for such procedural protections as the particular situation demands in order to minimize the risk of error," Harrison v. Fed. Bureau of Prisons, 464 F. Supp. 2d 552, 556 (E.D. Va. 2006). In Hewitt v. Helms, 459 U.S. 460 (1983), the Supreme Court provided some guidance, stating that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate," and that "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates." 459 U.S. at 477, n.9. Although such periodic reviews "need not be extensive, ... the review must be meaningful; it cannot be a sham or a pretext." Toevs v. Reid, 685 F.3d 903, 912 (10th Cir. 2012).

The process plaintiff received while in RRJ's RHU satisfies the constitutional requirement of meaningful review. Throughout the roughly six-month period on which this suit is based, the Review Committee met multiple times to review the propriety of plaintiff's continued assignment to the RHU.[9] On average, between July 20, 2021—the date of the first review—and December 21, 2021—the date of the review during which the Review Committee decided to return plaintiff to general population—plaintiff's housing assignment was reevaluated roughly once every twelve days. Moreover, the Review Committee was comprised of professionals with different areas of expertise, such as mental health professionals, medical health professionals, officials tasked with ensuring institutional security, and case workers, which speaks to the committee's ability to identify a broad array of risks plaintiff could have faced by remaining in the RHU. Pursuant to RRJ policy, if even one committee member had disagreed with a decision to keep plaintiff in the RHU, the decision would have been transferred to the Chief of Support Services for further consideration, and plaintiff had the right to appeal his

---

[9] The record shows that the total number of reviews was actually higher, because plaintiff received other reviews of his housing assignment in addition to the formal reviews by the Review Committee. See [Dkt. No. 40-16] at 1-5 (separately listing "Classification Committee Review[s]" and other "review[s]").

classification via institutional kiosks.  See [Dkt. No. 40-22] at 10.  Finally, the record makes

clear that the Review Committee's process was not a sham because plaintiff was, in fact,

returned to general population from the RHU on December 21, 2021 at the Review Committee's

recommendation.

In addition, plaintiff received robust levels of process at the hearings  for the many

disciplinary violations he was charged with while in the RHU.  These proceedings included

notice of the nature of the charges against him, notice of the hearing date, an opportunity to be

heard and to present witnesses, and an opportunity to appeal the decision.  After these

proceedings, plaintiff received written explanations of the decisions, which often included an

explanation that plaintiff had been sentenced to spend additional time in the RHU.  These

disciplinary hearings augmented the Review Committee's consideration of plaintiff's

classification.  On this basis, the Court is satisfied that plaintiff received the due process to which

he was entitled with respect to his confinement in the RHU.

### 2.   _Conditions of Confinement in the RHU_

Plaintiff also argues that the conditions of his confinement within the RHU were

unconstitutional under the Eighth Amendment.  Such a claim requires proof of two elements:

that a prisoner suffered a "deprivation of [a] basic human need" that was objectively "sufficiently

serious" and that, subjectively, defendants acted with a "sufficiently culpable state of mind."

Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (quoting Strickler v. Waters, 989 F.3d 1375,

1379 (4th Cir. 1993)).  To be "sufficiently serious," a deprivation must be "extreme"—meaning

that it causes "a serious or significant physical or emotional injury" or creates "a substantial risk

of such serious harm resulting from … exposure to the challenged conditions."  De'Lonta v.

Angelone, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted).  As

for the second element, a defendant acts with deliberate indifference when he knows of

circumstances from which an inference could be drawn that plaintiff faced a "substantial risk of

18

serious harm," draws that inference, and then disregards the risk. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

Here, the undisputed facts preclude plaintiff from establishing either element. As for the objective factor,  defendant has provided a Declaration of Lieutenant Kevin Talley that establishes that the conditions within the RHU vary depending on whether the inmate is in disciplinary detention or in restricted confinement, with those in disciplinary detention having only basic necessities. [Dkt. No. 40-13] at ¶6. In addition, the condition may vary among inmates who are in restricted confinement depending on their security needs, although "[c]onditions in restricted confinement . . . at the very least include standard hygiene, meals, laundry, and medical treatment accommodations." <u>Id.</u> at ¶ 7 Most of plaintiff's descriptions of the conditions he experienced do not identify whether his detention was classified as disciplinary or administrative at the time. He does state that he was in HU-1-C-A when he "had to get chained up" and "wear paper gowns." [Dkt. No. 41] at 6. As explained in the Declaration of Lieutenant Marquis Binns, plaintiff was housed in HU-1-C-A while he awaited a disciplinary hearing for his January 4, 2022 charge of possession of contraband. [Dkt. No. 40-23] at ¶ F. Plaintiff does not dispute that during his time in the RHU, whether for disciplinary or administrative detention, he received all regularly scheduled meals and standard hygiene. Additionally, plaintiff acknowledges that he received an hour of recreation every day, although he adds that he was placed in restraints while out of his cell. [Dkt. No. 41] at 2. And although he claims he was denied access to privileges like visitation, use of the telephone, and access to the commissary, the record shows that plaintiff's conditions evolved during his time in the RHU. For instance, in his Complaint, plaintiff alleged that, while he was in restricted confinement, another inmate "was trying to bulley [sic] [him] and take [his] property/canteen," suggesting that he was able to access the canteen. [Dkt. No. 1] at 6. Additionally, in his Opposition to the Motion for Summary Judgment, plaintiff concedes that he was eventually permitted to use the

19

phone during his recreation time. [Dkt. No. 41] at 6.[10] Finally, plaintiff's altercations with others while in the RHU show that he was not fully cut off from social contact with others.

The conditions that plaintiff experienced in the RHU, whether viewed individually or cumulatively, do not satisfy the first element of an Eighth Amendment claim because there is no evidence that they caused plaintiff significant harm. The only evidence plaintiff offers of any injury is the conclusory allegations in his "sworn statement," in which he claims that "most of" his disciplinary violations were the result of "mental health issues [he experienced] from being in restricted confinement for so long." [Dkt. No. 41] at 5. He adds that "[t]o this day [he] see[s] and hear[s] things that's not there," but he fails to include any detail or facts to connect his symptoms to the conditions of his confinement in the RHU. Id. at 6.

Even if this vague description of psychological injury were sufficient to satisfy the objective element of an Eighth Amendment claim, plaintiff has not satisfied the subjective element. The Fourth Circuit has stated that "a legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement ... even though such conditions create an objective risk of serious emotional and psychological harm" if "prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective." Porter v. Clarke, 923 F.3d 348, 362-63 (4th Cir. 2019). The existence of some valid penological purpose, the Fourth Circuit reasoned, could negate any presumption that prison officials were acting with

---

[10] In his Opposition, plaintiff raises issues regarding his access to the law library and being forced to accept a plea agreement. [Dkt. No. 41] at 7. These issues were not identified in the Complaint or Supplemental Complaint and plaintiff cannot add claims to his lawsuit by including them in his Opposition brief. See Hurst v. District of Columbia, 681 F. App'x 186, 194 (4th Cir. 2017) ("a plaintiff may not amend her complaint via briefing") (citing Comm of Pa. v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988)); Zachair, Ltd. v. Driggs, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (a plaintiff is "bound by the allegations contained in [his] complaint and cannot, through the use of motion briefs, amend the complaint."), aff'd, 141 F.3d 1162 (4th Cir. 1998).

malicious or sadistic intent in subjecting a prisoner to a particular condition.  Id. (citing Wood v. Beauclair, 692 F.3d 1041, 1050 (9th Cir. 2012)).

　　　　Plaintiff's extensive disciplinary record and history of assaulting both inmates and jail staff provide a clear penological justification for the conditions of his confinement in the RHU.[11] Remarkably, even while subjected to such conditions, plaintiff managed to continue to commit disciplinary offenses, which only further justified his prolonged confinement in the RHU.  Cf. Bass v. Perrin, 170 F.3d 1312 (11th Cir. 1999) (holding that the placement of two prisoners in segregation without access to outdoor recreation did not violate the Eighth Amendment because the prisoners had engaged in violent crimes while incarcerated).

　　　　Consistent with this analysis, the Court is satisfied that the conditions of confinement that plaintiff experienced within his cell in the RHU did not violate the Eighth Amendment; however, there is insufficient evidence in the record to resolve plaintiff's allegations that he was chained to a telephone for extended periods on two occasions, resulting in him urinating upon himself and passing out from dehydration.  Although defendants explicitly "deny that Mason was restrained for six hours and thus denied the bathroom as alleged in the Supplemental Complaint," see [Dkt. No. 40] at 17, n.5, they do not deny that he was later chained to the phone for so long that he passed out from dehydration, and  they have offered no evidence to disprove plaintiff's assertions.  Rather, the only evidence that defendants have provided regarding these two allegatgions is the Declaration of Lieutenant Marquis Binns, which acknowledges that plaintiff was placed in restraints during his "one-hour recreation period" on January 7 and January 22, 2022, and does not explicitly address how long plaintiff actually remained in restraints, whether Officer Jones and Sgt. McKelvin chained plaintiff to the phone, or any of his other allegations.

---

[11] Plaintiff does not dispute that he committed these offenses, and instead attempts to justify his behavior.  See [Dkt. No. 41] at 5 ("Also most of those incidents happened in restricted confinement because I was going through mental health issues from being in restricted confinement for so long.").

Moreover, defendants do not address the types of restraints used on plaintiff during these two incidents,[12] the protocol for escorting inmates who are held in plaintiff's housing unit, or any policy that addresses chaining inmates to fixed objects within the jail facility. Without additional evidence, plaintiff's claims regarding being chained to the phone on two occasions cannot be resolved.

The record suggests that only two defendants, Officer Jones and Sgt. McKelvin—the two officials plaintiff claims left him in chains for hours—could plausibly be held liable for this claim. These defendants will be directed to submit additional evidence and briefing regarding these claims. If video recordings of these two incidents exists, defendants are directed to submit them. Judgment will enter on behalf of the other defendants.

### 3. *Equal Protection and Release from the RHU*

The Complaint offers very little information to support plaintiff's equal protection claim; it merely alleges, "I'm still being held in Restricted Confinement not getting treated equally getting discriminated against by Lt. Kevin Talley." [Dkt. No. 1] at 5. In his Opposition to the Motion for Summary Judgment, plaintiff adds that inmates "with the same exact charges as [him] were released back to general population." [Dkt. No. 4] at 41. These allegations are insufficient to support a viable equal protection claim.

"To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). In the

---

[12] Plaintiff alleges that he was placed in "full restraints" during his recreational time. [Dkt. No. 1] at 5-6. Defendants should provide evidence clarifying the types of restraints that were used on plaintiff and provide any policies and protocols that address the use of such restraints. Exhibit E-1 to defendants' memorandum [Dkt. No. 40-21] does not refute plaintiff's claims.

prison context, disparate treatment is not constitutionally offensive if it is "reasonably related to [any] legitimate penological interests." Shaw v. Murphy, 532 U.S. 223, 225 (2001).

Here, although plaintiff alleges he received more severe treatment than other inmates who had committed identical disciplinary violations, he does not identify these inmates, state when they committed their offenses and when they were released from restrictive housing, or describe their disciplinary histories. Plaintiff's equal protection claim is thus supported only by a conclusory allegation and not actual facts on which the Court could determine if the inmates to whom plaintiff refers were truly "similarly situated" to him. Consequently, defendants are entitled to judgment in their favor as to this claim. See, e.g., Bickerstaff v. Vassar College, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a ... motion for summary judgment."); Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir. 1985) (finding plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places ... It's all around us" was conclusory and therefore insufficient to satisfy the requirements of Fed. R. Civ. P. 56(e)); Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice [for establishing a genuine dispute of material facts], nor does a mere scintilla of evidence in support of [the plaintiff's] case.").

## B.   <u>Qualified Immunity</u>

Defendants argue that they are entitled to qualified immunity. Because the record demonstrates that defendants are entitled to judgment on the merits of most of plaintiff's claims, the Court need not address the qualified immunity argument with respect to those claims. And because the Court concludes that the record requires further development with respect to the claim that plaintiff was twice left chained to a telephone, the Court will defer ruling on the qualified immunity argument as to that claim.

## IV. Conclusion

23

For the reasons stated above, through an Order that will accompany this Opinion, defendants' Motion for Summary Judgment will be granted in part and denied in part; defendants Lt. Kevin Talley, Major Frank Mack III, Superintendent Larry Leabough, and Sergeant Binns will be dismissed from this civil action; and defendants Sergeant McKelvin and Officer Jones will be directed to file a renewed Motion for Summary Judgment with additional briefing regarding the issues identified above.

Entered this 22ND day of March 2023.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge