IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| **Omari Keisaun Mason,** | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )   1:21cv1118 (LMB/JFA) |
| | ) |
| **Sergeant McKelvin, et al.,** | ) |
| **Defendants.** | ) |

MEMORANDUM OPINION

Before the Court is a Renewed Motion for Summary Judgment ("Motion") [Dkt. No. 47] filed by defendants Sergeant McKelvin and Officer Jones (collectively "defendants") in this civil rights action filed under 42 U.S.C. § 1983 by federal prisoner Omari Mason ("plaintiff"), who is acting pro se.[1] Defendants filed a Roseboro[2] notice advising plaintiff of his right to respond. [Dkt. No. 47] at 1, and plaintiff has filed two oppositions to the Motion. [Dkt. Nos. 59, 66].[3] Defendants have filed a Reply, [Dkt. No. 67], and without leave of court, plaintiff filed a sur-

---

[1] When plaintiff filed this action, he was a Virginia state prisoner being held at Riverside Regional Jail, where the events underlying his claims occurred. See [Dkt. No. 1-2]. On December 9, 2022, plaintiff notified the Court that he had been taken into federal custody. [Dkt. No. 44]. His most recent submissions and the Bureau of Prisons' inmate locator indicate that plaintiff is now housed at FCI Williamsburg in South Carolina. See, e.g., [Dkt. No. 66].

[2] See Roseboro v. Garrison, 258 F.2d 309 (4th Cir. 1975).

[3] In his first opposition, plaintiff claimed he did not receive defendants' Motion until roughly two months after it was filed and that he still had not been able to view the relevant video footage. [Dkt. No. 59] at 1. In his second opposition, styled as a "Motion to Oppose Defendants' Second Motion for Summary Judgment," plaintiff stated that he had finally viewed defendants' video evidence. [Dkt. No. 66] at 1. Because plaintiff made declarations under penalty of perjury that the statements in his two oppositions are true and correct, the oppositions will be considered as evidence relevant to the assessment of defendants' pending Motion for Summary Judgment; however, because it was not necessary for plaintiff to file a motion for leave to oppose a motion, his "Motion to Oppose" will be denied.

reply. Although plaintiff's sur-reply violates Local Rule 7(F)(1), the Court has considered it. For the reasons explained below, defendants' Motion will be granted, and this action will be dismissed.

## I. Background

Plaintiff filed this civil rights action in October 2021, alleging that officials at Riverside Regional Jail ("RRJ") improperly placed him in restricted confinement and held him there in violation of his due process rights. [Dkt. No. 1]. In June 2022, plaintiff filed a Supplemental Complaint, alleging that, on two occasions in January 2022, two officials—Segreant McKelvin and Correctional Officer Jones—chained him to a telephone for extended periods, causing him to urinate on himself and to pass out from dehydration. [Dkt. No. 33].

The defendants named in the Complaint and Supplemental Complaint filed a Motion for Summary Judgment, [Dkt. No. 39], and, on March 22, 2023, the Court granted defendants' motion in part and denied it in part, [Dkt. Nos. 45, 46]. Specifically, defendants' motion was granted with respect to plaintiff's restricted housing claims and denied with respect to plaintiff's claims regarding being improperly left in full restraints. Id. As directed by the March 22, 2023 Order, defendants McKelvin and Jones filed a Renewed Motion for Summary Judgment, along with additional evidence and briefing on the sole remaining claim. With respect to that claim, the following facts are undisputed.[4]

At all times relevant to this civil action, plaintiff was an inmate housed at RRJ, a correctional facility in North Prince George, Virginia. Plaintiff has been incarcerated at RRJ on at least six different occasions. He first arrived as an inmate at the facility on November 14,

---

[4] For the sake of judicial economy, much of the Statement of Undisputed Facts from the March 22, 2023 Memorandum Opinion is reproduced here, along with relevant newly submitted facts.

2

2016. See [Dkt. No. 40-19] at 3. On March 18, 2020, he was booked at RRJ based on the criminal charges for which he later served a state sentence. [Dkt. No. 40-20] at ¶ 5. Although plaintiff was released on bond on March 21, 2020, he returned to RRJ on June 15, 2020 after being charged with being a violent felon in possession of a weapon and for possession of marijuana. [Dkt. No. 40-4] at 4; [Dkt. No. 40-19] at 2. Plaintiff was again released on bond on June 19, 2020, but he returned to RRJ on August 19, 2020.[5] See [Dkt. No. 40-6] at 1; [Dkt. No. 40-19] at 2; [Dkt. No. 40-20] at ¶ 6.

During his previous periods of incarceration at RRJ, plaintiff incurred many disciplinary charges. On October 4, 2020, while conducting a security and observation round, Officer Mayes noticed that plaintiff was not in his assigned cell. [Dkt. No. 40-15] at 12. After Mayes found plaintiff in a different cell and escorted him back to his own cell, plaintiff stated, "That's aight, I will see you on the outside. I don't fight officers, only closed caskets." Id. For these actions, plaintiff was charged with "entering the cell of another inmate without the permission of an officer," "escape or attempt to escape," and "insinuated threat or behavior." [Dkt. No. 40-15] at 11.

On October 15, 2020, Officer Casey issued numerous warnings to "the top tier"—where plaintiff was housed—that its recreation period was ending and that its occupants would soon be required to return to their cells. [Dkt. No. 40-15] at 10. After Casey issued an actual order for inmates to return to their cells, plaintiff refused and was seen remaining "in the dayroom." Id. Consequently, plaintiff was charged with "failing to immediately lockdown when instructed to do so," "plotting and planning to break the law or these rules," and "failing to follow the directions of staff thereby causing a security breach." Id. at 9.

---

[5] The Court has not been able to discern the specific reason plaintiff returned to RRJ.

On December 15, 2020, Sergeant Sample observed plaintiff "in the hallway" when he should have been in the "One Delta pod." [Dkt. No. 40-15] at 7. When Sample asked why plaintiff was not in his assigned area, plaintiff stated that "he had to give a number to his homeboy." Id. For these actions, plaintiff was charged with "loitering, hiding, or being in an unauthorized area." Id.

On January 23, 2021, as Officer Mayes attempted to serve plaintiff his dinner, plaintiff attempted to escape his cell, pushing Officer Mayes away in the process. [Dkt. No. 40-15] at 5. Mayes pushed plaintiff back into his cell, at which point plaintiff "grabbed [Mayes'] neck, scratching [him] in the process." Id. Mayes then sprayed plaintiff with an "OC canister." Id. Despite having been sprayed, plaintiff then "ran to the top tier" before being handcuffed and taken to the medical department for assessment. Id. For this incident, plaintiff was charged with "assault on staff." Id.

On July 14, 2021, an unidentified individual "observed [plaintiff] on Facebook Live [] smoking what appeared to be marijuana" within RRJ. [Dkt. No. 40-13] at ¶ 9. In response, Major Mack and Lt. Brown entered and searched plaintiff's cell. Id. The officials found "[a] white powdery substance on [plaintiff's] body," a cell phone, a USB charger adapter, an iPhone charger, a red Sharpie marker, a black Sharpie marker, a red pen, and two cigarette butts. Id. Plaintiff was moved from his cell to "pre-hearing detention housing" and charged for his possession of contraband. Id. at ¶ 10.

On August 10, 2021, plaintiff was seen "throwing close[d] fist[s] and kicking" another inmate in the head. [Dkt. No. 40-14] at 20. As a result, he was charged with "assault, plotting and planning, and creating a security disturbance." [Dkt. No. 40-13] at ¶¶ 12-13.

On August 22, 2021, plaintiff was charged with "creating a security disturbance causing staff to respond," "insinuated threat or behavior," and "lying to staff." [Dkt. No. 40-14] at 13. This occurred after plaintiff witnessed a correctional officer provide a snack bag to another

4

inmate, at which point plaintiff stated, "Fuck me, right! I want to kill myself. [G]et somebody down here." Plaintiff then "stated he would throw piss at [the officer] if [he] did not get another staff member." Id. at 11-17.

On September 3, 2021, plaintiff expressed a desire to kill himself after being told he could not take a shower. [Dkt. No. 40-14] at 18. Plaintiff voluntarily sat in a restraint chair and was temporarily transferred to booking for observation before being transported back to the RHU at approximately 1:15 a.m. Id.

On September 19, 2021, Sgt. Kindred announced that the inmates in plaintiff's housing unit were scheduled to undergo drug testing via urinalysis. [Dkt. No. 40-14] at 8. Plaintiff refused to undergo testing and was charged with "failing to obey the instructions of an officer and other staff at all times." Id.

On September 21, 2021, Major C. Armstrong searched plaintiff's cell and discovered that "the light switch cover had been removed and a clothesline was tied to one of the exposed wires." [Dkt. No. 40-16] at 17. Armstrong additionally found that "[t]he mattresses on both the top bunk and bottom bunk had extra mattress stuffing from what appeared to be at least two other mattresses." Id. Finally, Armstrong found "two cups containing several unknown pills" and a lighter. Id. Based on these findings, plaintiff was charged with "destroying state or authority property," "possessing contraband," and "hoarding or attempting to hoard medication." Id.

On or around November 11, 2021, plaintiff was witnessed on video "throwing left and right punches toward[]" another inmate and was consequently charged with "assault" and "entering the cell of another." [Dkt. No. 40-15] at 15.

On January 4, 2022, RRJ officials searched plaintiff's cell and discovered a cell phone. [Dkt. No. 40-23] at ¶ 3. Plaintiff was charged with possession of contraband and placed in prehearing detention while awaiting a disciplinary hearing. Id.; [Dkt. No. 40-17] at 1.

5

On January 7, 2022, plaintiff remained housed in the prehearing detention area, sometimes called "HU-1-C-A." Plaintiff began his recreation period that day at roughly 11:40 a.m. [Dkt. No. 48-21] at 1, ¶¶ 3-4; [Dkt. No. 23] ("Video Footage") at 43:35. Because all inmates held in prehearing detention are placed in restraints during their recreation period, see [Dkt. No. 48-21] at 1, ¶ 4, plaintiff was restrained after leaving his cell, see Video Footage at 43:50. And because plaintiff requested to use the telephone during his recreation period on that day, see [Dkt. No. 48-21] at 2, ¶ 5, he was "secured to the telephone" by a set of handcuffs, see Video Footage at 44:32 – 45:25. Plaintiff remained restrained to the telephone for at least the next five hours,[6] see Video Footage at 44:32 – 6:29:33, but was periodically monitored by RRJ officials, see id. at 1:26:51; 2:06:14; 2:54:10; 4:10:33; 4:40:34; 5:10:36.[7]

On January 11 or 12, 2022,[8] plaintiff was still housed in the "HU-1-C-A" and was once more secured to the telephone during his recreation period.[9] [Dkt. No. 48-21] at 2, ¶ 7. Plaintiff

---

[6] The video supplied by defendants ends at 4:41:39 E.S.T. See Video Footage at 6:29:33. Defendants attest that they "do[] not possess [] additional video," see [Dkt. No. 48-22] at 2, ¶ 4, but do not explain why this is so.

[7] The parties dispute whether plaintiff requested to use the restroom during this period and whether he urinated on himself before his recreation period ended. Plaintiff claims that the video evidence defendants submitted depicts him urinating on himself five hours and thirty-one minutes into the video. See [Dkt. No. 66-1]. At this point in the video, plaintiff is facing away from the camera. See Video Footage at 5:30:54 – 5:37:10. When plaintiff turns back around, there is no liquid visible on the ground or discoloration on his pants. Id.

[8] Plaintiff's Supplemental Complaint does not provide a precise date for the second of his recreation time claims, stating only that his claim arose "[a] day or two after" the first incident. [Dkt. No. 33] at 6. Defendants' evidence suggests this event occurred on January 11, while their brief suggests it occurred January 12. Compare [Dkt. No. [48-22] at 2, ¶ 7, with [Dkt. No. 48] at 6. This inconsistency is unimportant because the precise date on which the events occurred is not material to the resolution of plaintiff's claim.

[9] Plaintiff has been inconsistent in his description of the length of time he was restrained on the second occasion. In his Supplemental Complaint, he claimed to have been restrained for "2 or 3

6

was monitored by RRJ officials throughout this period. Id. At an unspecified time that day, plaintiff was assessed by medical staff after he "purportedly fainted while on the phone." Id. at ¶ 8. The parties do not dispute that plaintiff had access to water in his cell before the start of his recreation period.[10] Id. at ¶ 11.

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Variety Stores v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018). Once the moving party has met its burden to show that it is entitled to judgment as a matter of law, the nonmoving party "must show that there is a genuine dispute of material fact for trial ... by offering sufficient proof in the form of admissible evidence." Id. (quoting Guessous v. Fairview Prop. Inv'rs., LLC, 828 F.3d 208, 216 (4th Cir. 2016)). In evaluating a motion for summary judgment, a district court must consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences from those facts in favor of that party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## III. Analysis

Before turning to the merits of defendants' Motion for Summary Judgment, the Court will briefly address two of plaintiff's concerns about the evidence present in, and absent from,

---

hours." [Dkt. No. 33] at 6. In his second opposition, he claims to have been restrained for "about 5 or 6 hours." [Dkt. No. 66] at 4.

[10] Defendants assert that they "do[] not possess video footage of when Mason had his recreation period of January 11, 2022." [Dkt. No. 48-22] at 2, ¶ 5.

7

the record. First, plaintiff asserts that any evidence regarding his disciplinary record at RRJ is irrelevant to the issues in this action. See, e.g., [Dkt. No. 59] at 12 ("The relevancy of my criminal charges allude [sic] me especially when it has nothing to do with the on-going litigation, most of those charges are frivolous and got dismissed or nolle pros."). Contrary to plaintiff's beliefs, the institutional charges plaintiff incurred—including for threats and attacks on both staff and fellow inmates—are directly relevant to the reason he was restrained during his recreation period. Indeed, as defendants state, it is RRJ's policy to restrain inmates, like plaintiff, who are awaiting a disciplinary hearing or have been placed in restrictive housing for their "past [] incidents and violations." [Dkt. No. 48-21] at ¶ 4.

Second, plaintiff takes issue with defendants having submitted video footage from only one of the two days during which he was restrained to a telephone. He goes as far as to suggest that defendants have engaged in spoliation of evidence. See, e.g., [Dkt. No. 59] at 2 ("Defendants are trying to cover their actions up and are intentionally hiding material evidence from the Court.").

To the extent that plaintiff may be seeking relief for alleged spoliation, he is not entitled to such relief. Although the failure to preserve evidence may, in certain circumstances, allow for an adverse inference against the party responsible for the evidence's safekeeping,[11] an adverse inference would not be appropriate here because there is no evidence that defendants—who served as employees of a correctional staff and are not information technology officers—had any control over capturing or maintaining the video in question. Cf. Rivera v. Dickenson, No. 7:14cv573, 2015 WL 5565273, at *6 n.7 (W.D. Va. Sept. 21, 2015) ("Moreover, Rivera presents

---

[11] See, e.g., Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995) ("Under the spoliation of evidence rule, an adverse inference may be drawn against a party who destroys relevant evidence."); Fed. R. Civ. P. 37(e)(2),

8

no evidence that defendant Scott or any of his medical supervisors had any responsibility over the photographs at any time. Therefore, I cannot find that Rivera is entitled to have any adverse inference drawn against Scott on summary judgment, based on the loss of the video footage and photographs."); Fed. R. Civ. P. 37(e)(2) (providing that only upon finding that a "party acted with the intent to deprive another party of the information's use in the litigation" may the court impose severe sanctions such as granting a default judgment before trial or instructing the jury to presume "that the lost information was unfavorable to the party").

Having addressed plaintiff's concerns regarding evidence, the Court must clarify the scope of the claims remaining in this civil action. In his Supplemental Complaint, plaintiff makes clear that he believes being handcuffed to a telephone on the two occasions in question violated his rights under the Eighth Amendment, both because of the alleged tightness of the handcuffs and because he was allegedly left to urinate upon himself and lose consciousness.[12] [Dkt. No. 33]. Plaintiff has attempted to add several claims by including them in his oppositions to defendants' Motion for Summary Judgment. For instance, plaintiff suggests in his first Opposition that defendants were "retaliating against [him]," see [Dkt. No. 59] at 4, and in his second Opposition he invokes both the Equal Protection Clause and the state tort doctrine of negligence, see [Dkt. No. 66] at 1, 3. These belatedly identified claims will not be considered because a plaintiff may not amend his complaint through briefing. See Hurst v. District of Columbia, 681 F. App'x 186, 194 (4th Cir. 2017) (stating that "a plaintiff may not amend her complaint via briefing") (citing Comm of Pa. v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.

---

[12] Plaintiff also claims in his Supplemental Complaint that these actions violated his rights under the Fifth and Fourteenth Amendments. See [Dkt. No. 33]. Because these amendments have no apparent relevance to plaintiff's claims, the Court will not discuss them further.

1988)). Accordingly, although the Court is aware of the Fourth Circuit's instruction in <u>Shaw v. Foreman</u>, 59 F.4th 121, 128 (4th Cir. 2023), to provide "thoughtful consideration of all factual allegations, and *not just expressly pled claims*," consideration of any claims other than plaintiff's Eighth Amendment claim would be improper here.

An Eighth Amendment claim requires proof of two elements: that a prisoner suffered a "deprivation of [a] basic human need" that was objectively "sufficiently serious" and that, subjectively, defendants acted with a "sufficiently culpable state of mind." <u>Shakka v. Smith</u>, 71 F.3d 162, 166 (4th Cir. 1995) (quoting <u>Strickler v. Waters</u>, 989 F.3d 1375, 1379 (4th Cir. 1993)). To be "sufficiently serious," a deprivation must be "extreme"—meaning that it causes "a serious or significant physical or emotional injury" or creates "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). As for the second element, a defendant acts with deliberate indifference when he knows of circumstances from which an inference could be drawn that plaintiff faced a "substantial risk of serious harm," does draw that inference, and then disregards the risk. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

Here, there is no evidence that plaintiff suffered an injury that was sufficiently serious to support a constitutional violation. First, although plaintiff has submitted his sworn statements claiming that he urinated on himself on January 7, 2022, the video evidence submitted by defendants does not support this claim. In his Second Opposition, plaintiff specifically asserts that the video depicts him urinating on himself five hours and thirty-one minutes into the footage. [Dkt. No. 66-1]. But, at this point in the video, plaintiff can be seen facing away from

the camera, and when he returns to face forward, there is no liquid visible on the ground or stains on his clothes.[13] See Video Footage at 5:30:54 – 5:37:10.

Moreover, the evidence does not show that plaintiff suffered any significant injury when he lost consciousness, allegedly due to dehydration. With respect to this issue, even plaintiff's sworn statement fails to offer any description of a serious injury; the statements merely provide the vague assertion that plaintiff suffered "a [sic] injury to [his] head" [Dkt. No. 59] at 5, and that "ever[] since I fell and hit my head it's like a certain sound that won't go away," [Dkt. No 66] at 7. Importantly, the statements do *not* claim that plaintiff suffered a concussion or has otherwise endured any serious effects from this incident. As a result, plaintiff's Eighth Amendment claim is not supported by any evidence. Cf. Taylor v. Doe, No. C.A. 9:01-4118-25BG, 2002 WL 31996020, at *2, *6 (D.S.C. July 31, 2002) (finding allegations that plaintiff's "kidney was killing [him]" and that "a rash accrued on [his] forehead and between [his] legs" were "altogether too vague and speculative to support any claim of an objective injury").

Next, even assuming plaintiff did suffer a sufficiently serious injury while restrained, the record does not allow for any inference that defendants were deliberately indifferent to plaintiff's needs. For instance, with respect to plaintiff's dehydration claim, plaintiff concedes in his First Opposition that at an unstated time, defendant Jones "told [another officer] to bring [plaintiff]

---

[13] Even assuming plaintiff did urinate upon himself, many courts that have considered similar facts have concluded that such an "injury" is not sufficiently serious to trigger Eighth Amendment protections. See, e.g., Baker v. Clarke, No. 7:20-cv-204, 2020 WL 3422198, at *2 (W.D. Va. June 22, 2020) (opining that "the denial of bathroom access for a limited period of time, even when it resulted in the prisoner soiling himself, did not constitute a violation of Eighth Amendment rights"); Key v. McKinney, 176 F.3d 1083, 1085–86 (8th Cir. 1999) (concluding that a prisoner restrained in handcuffs and shackles for twenty-four hours, who urinated on himself as a result, failed to establish a constitutional violation); Whitted v. Lazerson, No. 96 Civ. 2746 (AGS), 1998 WL 259929, at *2 (S.D.N.Y. May 21, 1998) (finding no Eighth Amendment violation where plaintiff was occasionally prevented from using the restroom and urinated or defecated on his clothing).

11

water" but that the officer failed to carry out the order. [Dkt. No. 59] at 15. This evidence directly undermines plaintiff's claim because it indicates that Jones was not indifferent to plaintiff's needs but instead sought to assist plaintiff. Moreover, once plaintiff did pass out, he concedes that he was promptly taken to medical officials, who provided him fluids. [Dkt. No. 66] at 7 ("I was dehydrated and needed fluids and was provided with them.").

As for plaintiff's allegations that his handcuffs were too tight, plaintiff's second opposition includes a timeline of the events depicted in the video evidence and concedes that the handcuffs placed on his wrist did not begin to bother him until roughly four hours into the period of restraint. [Dkt. No. 66-1] ("@ 5:38 my wrist started getting cut into."). The remainder of the video does not show any guards conducting rounds, and plaintiff therefore could not have complained to any guards about the cuffs in that time. These facts lead to two important inferences that undermine plaintiff's claim: first, the cuffs were not excessively tight at the beginning of plaintiff's period of restraint; and, second, the named defendants could not have ignored or been indifferent to plaintiff's claims that his cuffs were too tight because they were not present to receive any such complaints.

## IV. Conclusion

For these reasons, no reasonable finder of fact could determine from the evidence in this record that either of these two defendants violated plaintiff's constitutional rights. Consequently, the Motion for Summary Judgment filed by defendants McKelvin and Jones will be granted in an Order that will accompany this Memorandum Opinion.

Entered this  17th  day of October 2023.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge